UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

RONALD LEO AND KATHLEEN LEO

VERSES

JELD-WEN, INC.

CIVIL ACTION

NO.: 16-00605-BAJ-EWD

RULING AND ORDER

Before the Court are dueling motions for partial summary judgment. Defendant, JELD-WEN, INC., filed its **Motion for Partial Summary Judgment (Doc. 14)** seeking dismissal of Plaintiffs' redhibition claim based on prescription. Plaintiffs, Ronald and Kathleen Leo, request that the Court grant their **Motion for Partial Summary Judgment (Doc. 18)** to declare that their JELD-WEN windows contain a redhibitory defect as a matter of law. For the reasons that follow, Defendant's motion is **DENIED** and Plaintiffs' motion is **DENIED**.

I. BACKGROUND

Between 2007 and 2008, Precision Construction Group ("PCG") built Plaintiffs' home. (Doc. 1-2 at ¶ 3). In 2007, Plaintiffs purchased approximately fifty JELD-WEN windows for installation into their new home. (Doc. 2-1 at p. 2). Upon moving into the home in December 2008, Plaintiffs noticed water leaking into the home. (Doc. 1-2 at ¶¶ 7–8). Plaintiffs reported the leaks to PCG. (Doc. 2-1 at p. 2). In response, PCG had a subcontractor perform additional waterproofing and caulking on Plaintiffs' home. (Doc. 17-1 at pp. 1–2, ll. 22–25, 1–25). Still, water continued to leak into the home. (Doc. 17-2 at p. 2). Plaintiffs hired American Leak Detection ("ALD")

to inspect the home in September of 2012. (*Id.*). ALD identified numerous potential sources of the leak, including a potential roof flashing issue and insufficient caulking around the windows. (*Id.;* Doc. 17-3 at pp. 1–2).

On November 7, 2012, Plaintiffs contacted their general contractor in an email that stated that they "had two leak detection companies out here to check, but no one is sure where the leak is." (Doc. 14-4 at p. 2). According to the email, "[o]ne guy thought it was the seal around the windows." (*Id.*) The general contractor responded in an email saying that he believed they had "found the majority of the causes" and proposed a set of actions including sealing the flashing, caulking the windows, applying sealer, and inspecting the windows. (Doc. 17-4 at p. 2). On November 14, 2012, another subcontractor performed an inspection of the windows. (*Id.*; Doc. 17-5 at p. 1, ll. 2–24). Reportedly, the subcontractor noticed potential water intrusion on one window. (Doc. 17-7 at p. 1 ll. 3–8). Based on these inspections, PCG issued a quote to make repairs that exceeded $50,000, dated February 20, 2013. (Doc. 17-8 at p. 2).

On March 18, 2013, Kathleen Leo filled out a JELD-WEN Customer Care online form. (Doc. 14-5 at p. 3). Kathleen Leo wrote, "[o]ur windows are leaking. There is evidence that water is getting through the seals, because when the window is opened we can see where the wood inside the window frame is discolored." (*Id.*). On July 23, 2013, Kathleen Leo once again called JELD-WEN Customer Care to report a "leak around the window." (*Id.* at p. 7). In response to the second phone call,

2

Defendant suggested that Plaintiffs contact a JELD-WEN authorized service provider. (*Id.*).

Although the record is not clear on the exact time period, sometime after PCG's repair quote, Ronald Leo contacted his homeowner's insurance. (Doc. 17-10 at p. 1, ll. 5–20). The insurer denied his claim because it reportedly told him the issues with his home "were all due to construction error." (*Id.* at pp. 1–2, ll. 22–25, 1–11).

On November 8, 2013, Plaintiffs sued PCG, alleging that the causes of the water intrusion were construction defects and improper installation of the windows. (Doc. 14-6 at p. 1). That lawsuit was subsequently removed to arbitration. (Doc. 14-7 at p. 1). Plaintiffs' arbitration demand stated that the "windows were improperly installed and inadequately waterproofed, including but not limited to inadequate flashing, caulking, and sealing. " (*Id.* at ¶¶ 95–98). Arbitration continued until July 2015, when Plaintiffs settled their claims against PCG. (Doc. 14-1 at p. 5).

After the close of arbitration, Kathleen Leo rented a thermal imaging camera on July 15, 2015. (Doc. 14-8 at p. 4). Although Kathleen Leo was not trained in the use of the camera, she pointed it at the windows to see if she could spot any problems. (Doc. 14-3 at p. 8, ll. 4–18). During this time, water continued to penetrate the house.

On September 8, 2015, Plaintiffs hired Charles Dixon to remediate alleged construction defects in the windows. (Doc. 17-11 at p. 1, ll. 2–7). After repairing what Dixon thought were improper caulking or flashing issues and applying a waterproof sealant on the exterior of the home, (Doc. 17-12 at pp. 1–2, ll. 7–25, 1–7), Dixon sprayed the windows with a water hose in an "unofficial test." (Doc. 17–3 at p. 4, ll.

1–6). When Dixon sprayed the windows with water, he noticed that water was still coming in through the windows. (*Id.*).

Following Dixon's report that water was still coming in through the windows, Plaintiffs contacted an authorized JELD-WEN service provider, Charles Doucet. (*Id.* at p. 4, ll. 7–9). Doucet inspected the windows and concluded that the frame weather stripping in the windows, which is installed at the factory, "were a little short" and "didn't quite meet up like they should." (Doc. 17-14 at p. 1, ll. 12–21). Reportedly, this alleged defect—which Doucet claimed would lead to water intrusion—was present throughout the house. (*Id.* at pp. 1–2, ll. 19–25, 1–2).

Plaintiffs filed the instant suit in Louisiana state court on August 30, 2016. (Doc. 1-1 at p. 1). Defendant timely removed the suit to this Court on the basis of diversity jurisdiction, 28 U.S.C. § 13332.[1] (Doc. 1).

## II. LEAGAL STANDARD

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether the movant is entitled to summary judgment, the court views the facts in the light most favorable to the non-movant and draws all reasonable inferences in the non-movant's favor. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).

---

[1] Plaintiffs are both Louisiana residents. (Doc. 1 at p. 3). Defendant is a Delaware corporation with its principal place of business in North Carolina. (*Id.*). Plaintiffs' claims exceed $75,000. (*See id.*; Doc. 1-1 at p. 5).

4

After a motion for summary judgment is filed, the non-movant "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal citations omitted). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Austin v. Kroger Tex., L.P.*, 846 F.3d 326, 328 (5th Cir. 2017) (quoting *Gates*, 537 F.3d at 417). At this stage, however, the court does not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

On the other hand, the non-movant's burden is not satisfied by some metaphysical doubt as to the material facts, or by conclusory allegations, unsubstantiated assertions, or a mere scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal quotations omitted). Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, summary judgment will lie only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *Sherman v. Hallbauer*, 455 F.2d 1236, 1241 (5th Cir. 1972).

## III. DISCUSSION

### A. Defendant's Motion

Under Louisiana law, a "seller warrants [a] buyer against redhibitory defects, or vices, in the thing sold." La. Civ. Code art. 2520. "A seller is deemed to know that the thing he sells has a redhibitory defect when [it] is a manufacturer of that thing." La. Civ. Code art. 2545. Prescription for a seller that is deemed to know of a redhibitory defect runs "one year from the day the defect was discovered by the buyer." La. Civ. Code art. 2534(B). However, "prescription is interrupted when the seller accepts the thing for repairs and commences anew from the day he tenders it back to the buyer or notifies the buyer of [its] refusal or inability to make the required repairs." La. Civ. Code art. 2534(C).

Whether prescription bars a plaintiff's claim is a mixed question of law and fact. *Tiger Bend, L.L.C. v. Temple-Inland, Inc.*, 56 F. Supp. 2d 686, 689 (M.D. La. 1999). The burden of proof is on the Defendant, who must prove by a preponderance of the evidence that the purchaser discovered the defect more than one year prior to filing suit. *Id.* at 692 (citing *Beth Israel v. Bartley*, 579 So. 2d 1066, 1072 (La. App. 4th Cir. 1991)). Louisiana law dictates that "prescription does not commence until the date the injured party discovers or should have discovered the facts upon which his cause of action is based. In determining when the plaintiff should have known of the basis for his claim, the focus is on the reasonableness of the plaintiff's action or inaction." *Id.* (quoting *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 982 F. Supp. 388, 395 (E.D. La. 1997)). "[P]escription on a redhibition claim does not begin to run

from the time the buyer first experiences problems, but from the time when the buyer discovers that the cause of those problems is a redhibitory defect." *Shopeze Food Stores, Inc. v. Tanwar*, 2000-1648 (La. App. 4 Cir. 8/30/00), 769 So. 2d 646, 648. As the Louisiana Supreme Court has explained regarding redhibition,

> Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage. On the other hand, a plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury.

*Jordan v. Emp. Transfer Corp.*, 509 So. 2d 420, 423 (La. 1987).

In cases where a potential defect is hard to discern, Louisiana courts have typically found that prescription did not begin to run until the buyers had consulted with an expert or found the cause of the problem themselves. For instance, in *Jordan*, the buyer's home had flooded after a heavy rainstorm in October of 1982. 509 So. 2d at 421. The repairmen the buyers brought in to remove the wet carpet told the buyers that the source of the leak could be the flashing on the roof, a broken pipe, or cracks in the foundation. *Id.* at 421–22. The buyer's insurance adjuster, who inspected the home, concluded that the likely source was a leak in the roof's flashing. *Id.* at 422. After repairing the flashing, however, the buyers noticed water seeping through the foundation when their home flooded a second time in December of 1982. *Id.* The buyers filed suit December of 1983, and the sellers argued that the buyer had discovered the potential defect in October 1982. *Id.* The Louisiana Supreme Court held that, although there had been water damage in October 1982, "prescription did not begin to run until [the buyers] had a reasonable basis to pursue a claim against

7

a specific defendant." *Id.* at 423–24; *see also LeGros v. ARC Servs., Inc.*, 98-387 (La. App. 3 Cir. 10/28/98), 721 So. 2d 1016, 1017–18 (holding that the buyer of a motor that had continuing mechanical troubles did not discover the redhibitory defect in the motor's cam-shaft until a mechanic found that the cam-shaft was the incorrect size, despite the buyer's earlier suspicion that the cam-shaft was the issue); *Beth Israel*, 579 So. 2d at 1075–77 (holding that defects in the construction of a roof were not discovered until over ten years after the roof had started to leak, where the buyers repeatedly hired inspectors, tried to repair the roof, and were told on multiple occasions that the leaks were due to improper maintenance).[2]

In contrast, courts have found prescription began to run when the defect would have been discoverable by a layman. *See Tiger Bend*, 56 F. Supp. 2d 692 (finding that the buyer had knowledge that its wooden siding contained a redhibitory defect when the siding started to deteriorate); *Gadpaille v. Thomas*, 43,412 (La. App. 2 Cir. 8/13/08), 990 So. 2d 126, 130 (finding that prescription began to run from the moment the buyers found large cracks in their home's walls).

Defendant argues that Plaintiffs were put on notice regarding the potential redhibitory defects in the windows more than a year prior to filing suit. (Doc. 14-1 at p. 2). Plaintiffs first noticed water intrusion around December 2008, when they moved into the new house; yet, Plaintiffs did not file the instant suit until August 30,

---

[2] *Beth Israel* relied on former Louisiana Civil Code article 2546, which allowed for an unlimited amount of time to discover the defect. *See Tiger Bend*, 56 F. Supp. 2d at 690. Article 2534, in conjunction with article 3499, now imposes an absolute ten-year limit on bringing a suit in redhibition, *see id.*, but *Beth Israel* is still persuasive on the issue of when a defect is discovered for purposes of the one-year prescriptive period.

2016. (Doc. 14 at p. 1; Doc. 14-1 at p. 2). According to Defendants, there were multiple points at which Plaintiffs should have been put on notice regarding a potential problem with the windows. (Doc. 14-1 at p. 2). First, in an email dated November 7, 2012, Kathleen Leo stated that they had "two leak detection companies" inspect the house and "one guy thought is [sic] was the seal around the windows." (*Id.* at p. 3 (quoting Doc. 14-4 at p. 2)). Second, on March 18, 2013, Plaintiffs submitted an online service request to JELD-WEN Customer Care, which stated that the windows were leaking. (*Id.* at p. 9). Third, on July 23, 2013, Plaintiffs called JELD-WEN Customer Care to again complain about water leaks with their windows. (*Id.* at pp. 9–10). Finally, on July 15, 2015, Plaintiffs rented a thermal imaging camera to examine the windows. (*Id.* at pp. 10–11). If the Court finds that Plaintiffs discovered or should have discovered the potential defects on any of these dates, then prescription would have run before Plaintiffs filed suit. (*Id.* at p. 11).

Plaintiffs argue that they were not put on notice of any redhibitory defects with the windows because they were "dealing with numerous potential water intrusion problems," and they thought the issues were construction defects, not manufacturing defects with the windows. (Doc. 17 at p. 10). Plaintiffs insist that they took numerous steps to discover the leaks and that multiple individuals were called in to inspect the areas where water was entering the house. (*Id.* at pp. 2–3). Plaintiffs aver that Kathleen Leo's November 7, 2012, email does not establish discovery of the defect because, despite consulting with two leak detection companies, they were unsure where the leaks were. (*Id.*). Plaintiffs claim that their requests to JELD-WEN

9

Customer Care does not establish the knowledge of the existence of a defect because (1) it referred only to one window, (2) JELD-WEN allegedly never followed up on the request, and (3) and they were relying on their general contractor to find the defects. (*Id.* at pp. 3–4). Further, Plaintiffs' homeowner's insurance denied Plaintiffs' claims because it determined that all leaks were due to construction errors. (*Id.* at p. 4). During this time period, Plaintiffs filed a lawsuit against their general contractor believing that the leaks were caused by improper installation of the windows. (*Id.*). On September 8, 2015, Plaintiffs had a contractor install a moisture barrier to deal with what they thought "was a flashing or caulking problem." (*Id.*). After that contractor told Plaintiffs that the windows themselves were leaking, Plaintiffs contacted a JELD-WEN authorized service provider who claimed "that the 'primary' frame weather stripping which is installed into the frame itself at the factory was an eighth of an inch short at the mitered corners." (*Id.* at p. 5). With regard to the thermal imaging, Plaintiffs insist that the thermal imaging did not reveal anything conclusive. (Doc. *Id.* p. 10).

According to Plaintiffs, they first discovered a potential defect with the windows on September 8, 2015, when a contractor "removed the entire exterior stone and stucco cladding and coated the substrate of the house, including at the integration of the windows into the interior wall system" with a moisture barrier. (*Id.* at pp. 4–5). After the contractor completed this work, he purportedly conducted an informal test on the sealing with a hose pipe, and he found that the water was still entering through the windows. (*Id.* at p. 5). At that point, Plaintiffs contacted a

JELD-WEN authorized service provider, who concluded that the problem was with factory-installed weather stripping on the windows. (*Id.*). The service provider later opined that all of the windows in the house suffered from this alleged defect. (*Id.*).

The Court will examine each of the points that prescription allegedly began to run in turn. Regarding the November 7, 2012, email message, the Court finds that this email does not sufficiently establish that the Plaintiffs had discovered—or should have discovered—the defect. The email states "I have had two leak detection companies out here to check, but no one is sure where the leak is." (Doc. 14-4 at p. 2). It goes on to say that "[o]ne guy thought it was the seal *around* the windows." (*Id.*) (emphasis added). One of the disputed issues in the case is whether the leak was caused by improper installation of the windows or whether it was caused by a defect in the window's weather stripping at the time of sale. (*See* Doc. 28 at p. 3). Water coming in around the windows could be the result of either improper installation or a defect in the windows. Therefore, Defendants have not met their burden of demonstrating that prescription began to run on this date.

Similarly, the Court finds that the March 18, 2013, contact between Kathleen Leo and Defendant's customer service unit does not sufficiently establish that Plaintiffs had discovered the alleged defect by that time. Plaintiffs' online request to JELD-WEN Customer Care stated:

> Our windows are leaking. There is evidence that water is getting in through the seals, because when the window is opened we can see where the wood inside the window frame is discolored. Water may also be leaking around the window, but it is hard to tell. We have raised the issue with our builder, who had contacted Jeldwen [*Sic*] on our behalf, but we are not satisfied with what little has been reported back to us.

11

> We believe some of the water leak issues to be a defect in the window itself and would appreciate a detailed investigation and report from your company as to the integrity of the existing windows in our home.

(Doc. 17-9 at p. 1). It is not clear what happened after Plaintiffs made this representation to Defendant. It appears that there were a couple of follow-up calls by JELD-WEN, but it does not appear that any further action was taken by either side. (*Id.* at pp. 1–2). Plaintiffs again contacted JELD-WEN on July 23, 2013, and JELD-WEN suggested contacting an authorized service provider in Plaintiffs' area. (Doc. 14–5 at p. 7). Kathleen Leo claims that she was just following her general contractor's instructions and representations to contact Defendant. (Doc. 17-7 at p. 1, ll. 9–15). Plaintiffs do not appear to have followed up with JELD-WEN's service provider at that time, but they continued to have their general contractor and others work on and inspect the windows.

Although this is a close issue, the Court finds that Plaintiffs did not discover, for purposes of prescription, the defect at this time. It appears that, similar to the buyers in *Jordan*, Plaintiffs knew that a window defect may be one of several potential reasons water was infiltrating the house, *see* 509 So. 2d at 421–22, but Plaintiffs continued to work with individuals who believed that the primary cause was improper instillation of the windows. (*See, e.g.*, Doc. 17-4 at p. 2; Doc. 17-10 at pp. 1–2, ll. 22–25, 1–11). The actions Plaintiffs took support this fact: shortly after these exchanges, they entered into a lawsuit and later an arbitration based on their belief that the cause of the water infiltration was improper installation of the windows. (Doc. 14-6 at p. 1; Doc. 14-7 at p. 1). When examining the reasonableness

12

of the Plaintiffs' action, the Court notes that Plaintiffs consulted with numerous experts, engaged in litigation against their general contractor, and had costly repairs performed on their house. (*See* Doc. 14-6 at p. 1; Doc. 14-7 at p. 1; Doc. 17-4 at p. 2; Doc. 17-10 at pp. 1–2, ll. 22–25, 1–11). Therefore, it appears as though Plaintiffs diligently searched for the cause of the leak, but they were still unable to find it. Even if Plaintiffs had a generalized idea that something may be wrong with their windows, it was just one of multiple competing theories that could have caused the leaks Plaintiffs repeatedly tried to remedy.[3]

Moreover, the evidence is ambiguous as to whether the Plaintiffs were concerned with all windows, or one particular window. Although Kathleen Leo's email starts off by saying "our windows are leaking," she goes on to discuss only one specific window in a bedroom. (Doc. 17-9 at p. 1). Therefore, it is not clear whether she suspected an issue with all windows or just this one window. Because this ambiguity must be resolved in favor of Plaintiffs, *see Coleman*, 113 F.3d at 533, the record does not clearly establish that Plaintiffs should have been aware that all of their windows contained a redhibitory defect.

Further, the Court finds that Kathleen Leo's amateur use of a thermal imaging camera that she rented on July 15, 2015, (Doc. 14-8 at p. 4), did not put Plaintiffs on notice that the defect was with the window itself. To the contrary, Kathleen Leo never had the data interpreted, and she stated that she could not tell what it meant.

---

[3] This conclusion is further supported by the fact that, although some experts stated the cause of the leaks may be the windows, no expert pointed to a specific problem with the windows' components until Doucet found that the factory-installed weather stripping did not meet at the edges. (Doc. 17-14 at p. 1, ll. 12–21).

(*See* Doc. 14-3 at p. 8) Kathleen Leo stated, concerning the camera: "I can't interpret what the imaging means, so, but I just rented it to sort of—because I was frustrated because I was not getting any definitive answers from anybody, so I saw on H.G.T.V. . . . one of those shows about the cameras, so I thought, well, I'm just going to get one of those cameras and just see what I can find." (Doc. 14-3 at p. 8, ll. 4–11).

The Court is persuaded that, although the Plaintiffs took extensive steps to discover and remedy the source of the water intruding into their home, they did not discover the potential defect in the window until September 8, 2015. At that point, Plaintiffs had contacted multiple experts and engaged in extensive repairs on their home to try and resolve the leaks. It was only after these repairs were completed that an expert pointed out that water was still coming in through the windows. (Doc. 17–3 at p. 4, ll. 1–6). The Plaintiffs may have had some vague suspicion that the windows were leaking, but like the buyers in *Jordan, Beth Israel*, and *LeGros*, Plaintiffs relied on experts who believed that the primary problem was improper installation of the windows, not the windows themselves. Accordingly, Defendants' motion is denied.

### B. Plaintiffs' Motion

In Louisiana, every sale "carries with it the legal warranty that the thing sold is free from hidden defects or redhibitory vices." *Johnson v. CHL Enters.*, 115 F. Supp. 2d 723, 728 (W.D. La. 2000). A redhibitory defect is one that "renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect." La. Civ. Code art. 2520. A

purchaser may pursue a redhibition action and "recover directly from the manufacturer for breach of warranty, despite the fact that there was no privity of contract between them." *Aucoin v. S. Quality Homes, LLC*, 2007-1014 (La. 2/26/08), 984 So. 2d 685, 692. However, such an action will only lie against the manufacturer for "defects which 'existed at the time the thing was delivered by the manufacturer to the seller.'" *Id.* (quoting La. Civ. Code art. 2531); *see also Casablanca Convertors, Inc. v. Morning Paper, Inc.*, 627 So.2d 699, 700 (La. App. 3 Cir. 1993) ("In order to establish a prima facie case in redhibition, a buyer must show that a non-apparent defect existed at the time of sale.").

Plaintiffs request that the Court declare that their windows contain a redhibitory defect as a matter of law. (Doc. 18 at p. 1). Plaintiffs claim that the "failure of the primary frame weather stripping to connect at the corners of the windows" is a redhibitory defect because this weather stripping is installed into the window frame at the point of manufacturing. (Doc. 18-1 at pp. 3–4). Specifically, Plaintiffs claim that Defendant's window specifications "call[ ] for the weather stripping to join at the mitered corners of the frame" so that the seal is airtight. (*Id.* at p. 4).

Defendants, on the other hand, argue that genuine issues of material fact still remain. (Doc. 28 at p. 1). First, Defendant claims that alleged gaps in the weather stripping of some windows do not establish a redhibitory defect in all windows. (*Id.* at pp. 1–2). Second, Defendant insists that there is no evidence that the alleged defect existed at the time the windows were purchased. (*Id.* at p. 2). Defendant further claims that the weather stripping could have become separated in severe weather.

15

(*Id.*). Third, Defendant asserts that a separated miter on the windows could be repaired, and therefore, the condition does not rise to the level of a redhibitory defect. (*Id.* at p. 7). Finally, Defendant argues that any damage by water intrusion was the result of improper installation. (*Id.* at p. 8).

In reply, Plaintiffs insist that they are merely seeking a declaration that a window that contains weather stripping too short to connect to the window's corner contains a redhibitory defect as a matter of law. (Doc. 32 at p. 1). Plaintiffs claim that they will still bear the burden at trial of establishing that the windows contained a redhibitory defect at the time of purchase. (*Id.*).

The Court does not agree with Plaintiffs' premise. It will not declare that the alleged flaw, if it were to exist at the time of purchase, would constitute a redhibitory defect. Louisiana law requires as an element of a redhibition claim against a manufacturer that the defect exist at the time the object was delivered to the seller. *See Aucoin*, 984 So. 2d at 693. Plaintiffs admit that they do not seek to prove that element in their motion for partial summary judgment (Doc. 32 at p. 1), and the record reveals that a genuine dispute of material fact still exists concerning when the defect occurred. (*See* Doc. 28-5 p. 2, l. 14 (Over time the weatherstrip [*sic*] can, you know, move.)). Thus, the Court will deny Plaintiffs' motion for partial summary judgment.

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's motion (Doc. 14) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' motion (Doc. 18) is **DENIED**.

Baton Rouge, Louisiana, this 11th day of May, 2018.

_____
BRIAN A. JACKSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA